# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

**Oct 14, 2022**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Jose Luis Aispuro-Quinonez, | ) | Case No. |
| Jesus Mateo Aispuro-Pena, | ) | 2:22-mj-0147 JDP |
| Daniel Cardenas, | ) | |
| Daniel Padilla-Gutierrez, | ) | |
| Maria Alicia Lucio-Castillo, | ) | |
| Ismael Miranda | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of     April 15, 2020 through June 22, 2022     in the county of     Butte, Sutter, and San Joaquin     in the

Eastern     District of     California     , the defendant(s) violated:

| Defendant | Code | Description |
|---|---|---|
| Jose Luis Aispuro-Quinonez | 21 U.S.C. §§ 841(a)(1), 846 | Conspiracy to distribute heroin; conspiracy to distribute methamphetamine; distribution of heroin; and distribution of methamphetamine |
| Jesus Mateo Aispuro-Pena | 21 U.S.C. §§ 841(a)(1), 846 | Conspiracy to distribute heroin; conspiracy to distribute methamphetamine; distribution of heroin; and distribution of methamphetamine |
| Daniel Cardenas | 21 U.S.C. §§ 841(a)(1), 846 | Conspiracy to distribute heroin and distribution of heroin |
| Daniel Padilla-Gutierrez | 21 U.S.C. §§ 841(a)(1), 846 | Conspiracy to distribute heroin and distribution of heroin |
| Maria Alicia Lucio-Castillo | 21 U.S.C. §§ 841(a)(1), 846 | Conspiracy to distribute heroin and distribution of heroin |
| Ismael Miranda | 21 U.S.C. §§ 841(a)(1), 846 | Conspiracy to distribute heroin |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
/s/ Kevin Rundle
*Complainant's signature*

_____
Kevin Rundle, Special Agent,
United States DOJ, DEA
*Printed name and title*

Sworn to me and signed via telephone.

Date: ___October 14, 2022___

_____
*Judge's signature*

City and state:   ___Sacramento, California___

Jeremy D. Peterson, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS, ARREST WARRANTS, AND SEARCH WARRANTS

I, Kevin Rundle, being first duly sworn, hereby depose and state as follows:

## I.      INTRODUCTION AND AGENT BACKGROUND

1.      This affidavit is submitted in support of criminal complaints charging Jose Luis AISPURO Quinonez and his co-conspirators, including Jesus Mateo AISPURO-PENA, Daniel CARDENAS, Daniel PADILLA-Gutierrez, Maria Alicia LUCIO-Castillo, and Ismael MIRANDA, with violations of Title 21 U.S.C. § 841(a)(1) (distribution or possession with intent to distribute heroin and/or methamphetamine), and/or Title 21 U.S.C. § 846 (conspiracy to distribute heroin and/or methamphetamine).

2.      I also make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for arrest warrants for the above-described individuals, as well as warrants to search the following five premises further described in Attachments A-1 through A-5, for the things described in Attachment B:

- The property located at 1044 South David Avenue, Space 18, Stockton, CA, 95205 (PREMISES 1), which is more particularly described in Attachment A-1;

- The property located at 715 South Olive Avenue, Stockton, CA, 95215 (PREMISES 2), which is more particularly described in Attachment A-2;

- The property located at 2632 Flemons Avenue, Stockton, CA, 95205 (PREMISES 3), which is more particularly described in Attachment A-3;

- The property located at 2125 Saint Lakes Way, Stockton, CA, 95206 (PREMISES 4), which is more particularly described in Attachment A-4; and

- The property located at 3436 Phelps St., Stockton, CA, 95206 (PREMISES 5), which is more particularly described in Attachment A-5.

3.      I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration (DEA), and have been since January 29, 2020.  In September 2019, I was selected by DEA to be a Special Agent and on January 29, 2020, I graduated from the DEA Basic Agent Training Class at the DEA Academy in Quantico, Virginia.  During this four-month training I received

specialized training from the DEA in the investigation of illicit drug trafficking including, but not limited to, Title 21 drug laws, drug identification, drug detection and interdiction, firearms proficiency, and asset forfeiture.  This intensive course familiarized me with conduct common among traffickers and how drug-trafficking organizations operate.  Through practical training exercises I was also able to become familiar with conducting surveillance and undercover operations in order to disrupt and dismantle drug-trafficking organizations.

4.      I began my career in federal law enforcement in June 2011, as a DEA Intelligence Research Specialist ("IRS").  During September 2011, I graduated from DEA's 11-week Basic IRS training course where I was instructed in topics including drug identification, report writing, analytical presentations, legal training, and the use of law enforcement databases.  After graduating I spent four years at DEA Headquarters working international money laundering cases, particularly targeting Mexican Cartels and a variety of independent money launderers moving United States drug proceeds through Colombia, Mexico, and throughout the Caribbean.  From 2015 to 2018, I served abroad for DEA in the Philippines where I continued to work international drug-trafficking cases.  Furthermore, in coordination with numerous federal agencies at the US Embassy in Manila, I regularly collected investigative intelligence on drug traffickers in the region and identified strategic drug-trafficking trends.

5.      Through my training, experience, and interaction with other experienced special agents, task force agents and officers, and other drug investigators, I have become familiar with methods, tools, and trends employed by drug traffickers to manufacture, smuggle, safeguard, store, transport, and distribute drugs, and to communicate with other participants to accomplish such objectives.   These methods include: the use of a vast network of associates and co-conspirators; instrumentalities to facilitate drug trafficking activities including real property and assets such as vehicles, vessels, and aircraft; multiple forms of counter surveillance; and complex communication methods which include various codes to deter detection by law enforcement and the use of an array of electronic devices including, but not limited to, cellular phones, pre-paid or debit calling cards, wireless communications technology such as paging devices, computers, and social media platforms.

6.      The facts and information set forth herein are based upon my personal knowledge and

AFFIDAVIT                                                    2

observations, observations of other law enforcement personnel, observations of cooperating individuals as related to me and other law enforcement personnel, my review of investigative reports, and discussions with other federal, state, and local law enforcement officials.  This affidavit is intended to show only that there is sufficient probable cause for the requested complaints and warrants and does not set forth all of my knowledge about this matter.

7.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a) and 846 (distribution and possession with intent to distribute and conspiracy to distribute heroin and/or methamphetamine) have been committed, are being committed, and will be committed by Jesus Luis AISPURO Quinonez and other known and unknown co-conspirators.  There is also probable cause to believe that searches of the locations described in Attachments A-1 through A-5 for the items described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of additional individuals who are engaged in the commission of these offenses.

## II.      PROBABLE CAUSE

### A.      Investigation Overview

8.      This affidavit is submitted in support of criminal complaints, arrest warrants, and search warrants to search the PREMISES located in the Eastern District of California used by **Jose Luis AISPURO Quinonez** and his co-conspirators, including Jesus Mateo AISPURO-PENA, Daniel CARDENAS, Daniel PADILLA-Gutierrez, Maria Alicia LUCIO-Castillo, and Ismael MIRANDA, to facilitate violations of Title 21 U.S.C. § 841(a)(1) (distribution or possession with intent to distribute heroin and/or methamphetamine), and Title 21 U.S.C. § 846 (conspiracy to distribute heroin and/or methamphetamine).[1]

9.      Based on law enforcement's investigation to date, I believe that AISPURO-Quinonez is a trafficker of heroin and methamphetamine and is currently operating within the Eastern District of California.  Based upon the ongoing federal investigation detailed below, I believe that AISPURO-

---

[1] Law enforcement is preparing and plans to submit a separate search warrant for a premises associated with one additional co-conspirator—Ismael MIRANDA.  That premises is located in the Central District of California, however, and thus that separate search warrant will be submitted for review and approval in that District.

Quinonez has been actively distributing heroin and methamphetamine in the Eastern District of California beginning in at least 2020 and continuing through the present date.

10.     More specifically, based upon the investigation described below, there is probable cause to believe that AISPURO-Quinonez coordinated the delivery to law enforcement officers of approximately 3.6 kilograms of a mixture and substance containing heroin, as well as approximately 1 pound of suspected crystal methamphetamine, during the period from April 2020 to the present.

11.     AISPURO-Quinonez is a large-scale poly-drug trafficker who partnered and agreed with multiple individuals to operate and profit from his drug-trafficking activities.  I believe that each of the below individuals engaged in multiple phone calls or text messages to facilitate their respective conspiracies and/or possession with intent to distribute heroin and/or methamphetamine.  These communications—some of which were conducted in recorded calls with two different DEA Confidential Sources, including Confidential Source 1 (CS1)[2] and Confidential Source 2 (CS2)[3]—served as overt acts of the overall drug-distribution conspiracy.  Details regarding the co-conspirators are as follows:

- **Jesus Mateo AISPURO-PENA** is AISPURO-Quinonez's son and is involved in the

---

[2] CS1 has previously provided information to the DEA that has been corroborated and proven to be reliable.  CS1 has conducted controlled purchases of narcotics from individuals related to this investigation where CS1 purchased one kilogram of suspected heroin and one pound of methamphetamine.  CS1 has also introduced an undercover law enforcement officer to a target subject, which in turn led to a traffic stop and search warrant resulting in the seizure of 62 pounds of methamphetamine, 3.2 kilograms of heroin, and approximately $52,500 in drug proceeds.  CS1 also provided information and conducted recorded calls which resulted in a traffic stop and seizure of one kilogram of heroin.  CS1 began working with the DEA after being arrested pursuant to DEA Sacramento's investigation in October 2020, after which CS1 admitted to participating in drug trafficking (though he/she minimized his/her role in the organization).  CS1 has been cooperating with law enforcement in exchange for possible leniency in charging and/or sentencing and deferred action in regards to their immigration status.  CS1 has not been paid by the DEA.  CS1's criminal history consists of being arrested in 2015 for possession/purchase of sale of narcotics, altering/removing ID mark on a firearm, and possession of a controlled substance while armed, but all three charges were dismissed in 2018.  Law enforcement also observed CS1 in November 2020 meeting with known heroin traffickers on two occasions without the controlling agent's prior knowledge.  When asked about one of these meetings, CS1 admitted to facilitating an introduction between traffickers who conducted a drug deal.  Regarding the other meeting, CS1 stated that the meeting was a social interaction during which there was discussion of drug trafficking, though no drugs were actually sold or used.

[3] CS2 is cooperating with law enforcement in exchange for monetary compensation.  Due to law enforcement interests, CS2 also receives immigration status through the Department of Homeland Security.  CS2 does not have any prior criminal convictions.  The information provided by CS2 in this specific investigation has also been corroborated by additional law enforcement collection techniques, and CS2 has provided valuable, reliable information to law enforcement in support of DEA investigations since 2013.

distribution of heroin and methamphetamine.  For example, on February 18, 2022, and March 25, 2022, AISPURO-PENA delivered heroin to CS1 on behalf of AISPURO-Quinonez.  Conversations between AISPURO-PENA and CS1 indicated that AISPURO-PENA had picked up additional heroin on behalf of his father.

- **Daniel CARDENAS** operates as a driver and distributor for AISPURO-Quinonez.  On April 27, 2022, CS1 was provided the phone number for CARDENAS by AISPURO-Quinonez, who subsequently delivered heroin to CS1.  Additionally, on June 7, 2022, CARDENAS picked up AISPURO-Quinonez at PREMISES 1 in Stockton, CA, in order to transport AISPURO-Quinonez to a controlled purchase of heroin with CS1.

- **Daniel PADILLA-Gutierrez and Maria Alicia LUCIO-Castillo** are heroin distributors who are known to work with AISPURO-Quinonez.  Using CS2, law enforcement has conducted two controlled buys of heroin from PADILLA-Gutierrez and LUCIO-Castillo—one on April 15, 2020, April 30, 2020—which resulted in the seizure of a total of approximately 200 grams of heroin.  Moreover, law enforcement surveillance has observed PADILLA-Gutierrez and LUCIO-Castillo participating in numerous additional suspected drug transactions.  Finally, on November 26, 2020, following recorded phone calls between AISPURO-Quinonez and CS1 (during which AISPURO-Quinonez indicated that PADILLA-Gutierrez would be picking up heroin from Stockton, CA), law enforcement conducted a traffic stop of PADILLA-Gutierrez and LUCIO-Castillo and found 1 kilogram of heroin.

- **Ismael MIRANDA** is believed to be a stash house operator working on behalf of AISPURO-Quinonez's brother, Jose FIDEL AISPURO-Quinonez.  CS1 was provided a phone number for MIRANDA by AISPURO-Quinonez, and MIRANDA proceeded to deliver one kilogram of heroin to CS1 and a NET-5 law enforcement agent acting in an undercover (UC) capacity in Los Angeles, CA, on March 2, 2021.

12.   The following locations within the Eastern District of California were utilized by the AISPURO-Quinonez drug trafficking organization to facilitate the organization's activities and violations of 21 U.S.C. §§ 841(a) and 846.

- **PREMISES 1** – Law enforcement agents have observed AISPURO-Quinonez depart directly from PREMISES 1 while in route to sell methamphetamine to CS1.  Law enforcement agents have also observed AISPURO-Quinonez and AISPURO-PENA return to PREMISES 1 with law enforcement funds after selling heroin to CS1.  Though not the primary residence of AISPURO-Quinonez, PREMISES 1 was the primary residence for AISPURO-Quinonez's sister Leticia Aispuro Quinonez and her husband Victor Lenin Rios Beltran.  Moreover, although evidence suggests they have acquired a new address, and it remains unclear where they are currently residing, AISPURO-PENA has been recently observed visiting PREMISES 1.  CS1 indicated that AISPURO-Quinonez spends much of his time at PREMISES 1 and has informed agents numerous times that AUSPURO-Quinonez has stayed at PREMISES 1 as a residence over the course of the investigation.  Furthermore, a commercial database query associates AISPURO-Quinonez with this address from 2007 to 2020 based on Experian credit reporting.

- **PREMISES 2 –** Analysis of vehicle tracker data showed that on November 26, 2020, a vehicle used by Maria LUCIO-Castillo and Daniel PADILLA-Gutierrez traveled to PREMISES 2 from Gridley, CA, before heading back north when they were stopped by law enforcement.  During this stop, a kilogram of heroin was seized from their vehicle.  PREMISES 2 is believed to be the primary residence in the United States for AISPURO-Quinonez.  A commercial database query associated AISPURO-Quinonez with this residence in 2020 based on credit data; however, PREMISES 2 was last linked via credit data to AISPURO-Quinonez's son, Jesus Mateo AISPURO-PENA, who agents also believe resides at this residence.  Additionally, CS1 indicated that this is the primary residence for both AISPURO-Quinonez and AISPURO-PENA.  CS1 had informed agents that while AISPURO-Quinonez was staying in Mexico, he had rented out the residence, but after returning to the US in 2022, he moved back into the location.

- **PREMISES 3** – Law enforcement agents observed AISPURO-PENA depart directly from PREMISES 3 and travel to a meeting location to sell heroin to a CS on March 25,

2022.  Additionally, on February 18, 2022, AISPURO-PENA drove directly to
PREMISES 3 after selling heroin to CS1 and receiving law enforcement funds.
Commercial databases show that PREMISES 3 is associated with multiple individuals
including Rosalva Aispuro, who is believed to have been the wife of AISPURO-
Quinonez and the mother of AISPURO-PENA.  CS reporting indicates that Rosalva
Aispuro and AISPURO-Quinonez are now separated.

- **PREMISES 4** – Law enforcement agents observed Daniel CARDENAS driving to
  PREMISES 4 after selling heroin to CS1 and receiving law enforcement funds on April
  27, 2022.  On June 7, 2022, CARDENAS drove AISPURO-Quinonez to sell heroin to
  CS1, after which law enforcement agents observed CARDENAS drive to PREMISES 1,
  to drop off AISPURO-Quinonez and depart approximately twenty minutes later to again
  drive to PREMISES 4.

- **PREMISES 5** – Law enforcement databases identify PREMISES 5 as the registered
  address for CARDENAS' white Kia Forte with CA LP: 8TAX443, which is a vehicle
  that has been used by members of the AISPURO-Quinonez drug-trafficking organization
  for the delivery of controlled substances during controlled buys.  Additionally,
  commercial databases give PREMISES 5 as the residence for Daniel CARDENAS along
  with multiple other members of the CARDENAS family based upon bank account
  records and credit reporting.

13.    This affidavit therefore requests authority to search the above locations (PREMISES 1
through 5), which are further described in Attachments A-1 through A-5, in order to locate and seize the
items described in Attachment B as evidence and instrumentalities of violations of Title 21 U.S.C. §
841(a)(1) (distribution and/or possession with intent to distribute heroin and/or methamphetamine), and
Title 21 U.S.C. § 846 (conspiracy to distribute heroin and/or methamphetamine).

**B.    Investigation Initiation**

14.    In April 2020, agents from the DEA Sacramento District Office began a joint
investigation with Yuba/Sutter Narcotics and Gang Enforcement Team (NET-5), Homeland Security
Investigations (HSI), and (in 2021) the Internal Revenue Service (IRS) (hereinafter "the Investigating

Agencies").  The Investigating Agencies were initially focused on the drug-trafficking activities of

PADILLA-Gutierrez and LUCIO-Castillo, who were known to be trafficking heroin in and around Butte

County and Sutter County, which are located in the Eastern District of California.  During 2020, the

Investigating Agencies received information that PADILLA-Gutierrez and LUCIO-Castillo were being

supplied by the heroin trafficker Jose Luis AISPURO-Quinonez.  The Investigating Agencies began

focusing on AISPURO-Quinonez and have conducted several enforcement actions seeking to tie

AISPURO-Quinonez to the distribution of heroin in Northern California.

15.    Notable activities and/or law enforcement observations concerning the AISPURO-

Quinonez organization's co-conspirators and their use of PREMISES 1 through 5 are described in more

detail in the sections and paragraphs below.

**C.    After Selling Heroin to CS2, LUCIO-Castillo Returns to 1130 California Street, Gridley, CA with Law Enforcement Funds on April 15, 2020**

16.    On April 15, 2020, beginning at approximately 2:54 p.m., and at the direction of law

enforcement agents, CS2 contacted telephone number 530-693-5849 to negotiate an anticipated

purchase of approximately four ounces of heroin to occur later the same day.  Through the course of

several telephone calls, CS2 negotiated with the female user of that phone number (who is believed to be

LUCIO-Castillo), who agreed to meet and sell CS2 four "pieces" of heroin in Sutter County, CA.

(Based on my training and experience a "piece" is a slang term for approximately 25 grams of heroin.)

These calls were recorded and conducted in the presence of law enforcement agents.

17.    Prior to this arranged controlled purchase, law enforcement agents established

surveillance at 1130 California Street, Gridley, CA, which is believed to be the residence of PADILLA-

Gutierrez and LUCIO-Castillo.  Agents observed a blue Ford pickup truck with CA LP: 6U24766

parked in an alley directly behind 1130 California Street.  A short time later, at approximately 3:30

p.m.—which is shortly after CS2's call with LUCIO-Castillo's suspected phone number—an agent

observed the blue Ford pickup truck depart from the area of 1130 California Street.  Agents continued to

follow the blue Ford pickup truck as it drove to the meeting location, which had been coordinated over

the phone between CS2 and LUCIO-Castillo.

18.    Preceding the meeting with LUCIO-Castillo, CS2 and CS2's vehicle were searched for

contraband and weapons, with negative results.  Law enforcement agents provided CS2 with a concealed recorder/transmitter.  Agents also provided CS2 with $3,200 in law enforcement funds for the anticipated purchase of heroin.  CS2 drove to the agreed upon meeting location, a public place on Encinal Road in Sutter County, CA.  CS2 was followed by law enforcement agents as he/she drove to the meeting location.

19.     Meanwhile, law enforcement agents continued surveillance of the blue Ford pickup truck as it drove from 1130 California Street to the meeting location on Encinal Road.  At approximately 4:15 p.m., agents observed the blue Ford pickup truck park near CS2's vehicle.  CS2 was observed meeting with the female driver and sole occupant of the blue Ford pickup truck.  The female individual in the blue Ford pickup truck was later confirmed through video surveillance to be LUCIO-Castillo based on her driver's license photograph.  CS2 was also shown a driver's license photograph of LUCIO-Castillo with no identifying information on it, which CS2 identified as "Lupe" from the meeting, an alias used by LUCIO-Castillo.  During their interaction, CS2 purchased 4 "pieces" of heroin from LUCIO-Castillo in exchange for the $3,200 in law enforcement funds.  The in-person interaction between LUCIO-Castillo and CS2 was monitored and recorded by law enforcement agents.

20.     At approximately 4:24 p.m., after the drug exchange with CS2 was completed, LUCIO-Castillo departed the meeting location alone in the blue Ford pickup truck.  CS2 returned to CS2's vehicle and departed in the opposite direction of LUCIO-Castillo followed by law enforcement agents. Law enforcement agents continued to conduct surveillance of the blue Ford pickup truck and noted it was driven directly from the meeting with CS2 and was, again, parked in the alley behind 1130 California Street.  LUCIO-Castillo was observed walking from the blue Ford pickup truck toward the residence located at 1130 California Street.  A short time later, surveillance of the blue Ford pickup truck and LUCIO-Castillo was suspended.

21.     Following the April 15, 2020 meeting, law enforcement agents met with CS2 and recovered a white bag containing two plastic-wrapped packages containing a substance which was sent to the laboratory for testing.  This testing confirmed that the substance was heroin (net weight 100.4 g $\pm$ 0.2 g).  CS2 confirmed these plastic packages were the heroin purchased from LUCIO-Castillo in exchange for $3,200 in law enforcement funds.  CS2 indicated that, during the exchange, LUCIO-

Castillo counted the law enforcement funds in front of CS2.  CS2 also indicated to agents that, during

CS2's interaction with LUCIO-Castillo, the two of them discussed the potential to conduct future

purchases of heroin and also methamphetamine.  Law enforcement agents then recovered the

recorder/transmitter from CS2, and CS2 and CS2's vehicle were again searched by agents for

contraband and government funds, with negative results.

> **D.    Surveillance of LUCIO-Castillo and PADILLA-Gutierrez Leaving and Returning to 1130 California Street, Before and After a Suspected Drug Deal on April 30, 2020**

22.      On April 30, 2020, beginning at approximately 1:50 p.m., law enforcement agents

established surveillance at 1130 California Street.  LUCIO-Castillo and PADILLA-Gutierrez's silver

Honda Pilot with CA LP: 6KHC268 and a blue Ford pick-up truck with CA LP: 6U24766 were parked

on the curb outside the residence.  (Law enforcement had previously obtained a vehicle tracker warrant

from this court for the blue Ford pick-up truck with license plate 6U24766.)

23.      At approximately 2:04 p.m., agents observed the silver Honda Pilot depart 1130

California Street being driven by a Hispanic female matching the description of LUCIO-Castillo.  The

silver Honda Pilot proceeded to travel south before turning west into a rural area containing numerous

orchards along W. Evans Reimer Road.  Agents were able to maintain surveillance on the vehicle as it

traveled down multiple single lane dirt roads in the general vicinity before circling back in an eastward

direction, even making a U-turn at one point.  Based on my training and experience and conversations

with more experienced agents, I believe this type of driving behavior is indicative of methods used by

drug traffickers to attempt to identify law enforcement surveillance, commonly referred to a counter-

surveillance.

24.      At approximately 2:33 p.m., agents observed a white Mazda minivan with CA LP:

7YUA517 stopped near the intersection of Onstott Frontage Road and Sanders Road.  The driver of the

vehicle was later identified by agents as William Thomas RUIZ based on his driver's license

photograph.  RUIZ's criminal history shows that he was most recently arrested in Marysville, California

on December 23, 2019, and was charged by the State of California with possession of a controlled

substance for sale.  RUIZ has previous convictions for this same charge in 2016, as well as a charge for

the transportation of a controlled substance in 2013.  RUIZ also has multiple convictions for possession

of a controlled substance.  Based upon his actions during the meeting with LUCIO-Castillo and
PADILLA-Gutierrez on April 30, 2020, which is described in more detail below, along with his criminal
history, I believe RUIZ remains involved in conducting drug transactions.

25.     As the silver Honda Pilot arrived at the location of the white Mazda minivan being driven
by RUIZ, the minivan proceeded to follow the silver Honda Pilot along Sanders Road.  At
approximately 2:34 p.m., agents observed both vehicles stop on the side of the rural road, and a male—
later identified by PADILLA-Gutierrez based upon a driver's license photo—exited the rear door of the
silver Honda Pilot and met with RUIZ in between the silver Honda Pilot and the white Mazda minivan.
Agents also observed that the female driver of the silver Honda Pilot (who, again, matched the
description of LUCIO-Castillo) remained inside the silver Honda Pilot while PADILLA-Gutierrez and
RUIZ met.  PADILLA-Gutierrez and RUIZ met between the two vehicles for less than thirty seconds.
After the meeting, PADILLA-Gutierrez returned to the silver Honda Pilot, and RUIZ returned to the
driver's seat of the Mazda minivan.  Both vehicles departed in different directions.  The silver Honda
Pilot proceeded to drive directly back to 1130 California Street, where agents observed LUCIO-Castillo
and PADILLA-Gutierrez get out of the silver Honda Pilot and walk toward 1130 California Street.

26.     After the deal, CS2 was shown a driver's license photograph of LUCIO-Castillo and
PADILLA- Gutierrez with no identifying information on them, which CS2 identified as "Lupe"
(LUCIO-Castillo) and "Primo" (PADILLA-Gutierrez) who had sold the 4 ounces of suspected heroin

27.     Based on my training and experience, and conversations with more experienced agents, I
know that drug traffickers use several methods and techniques to avoid identification by law
enforcement.  These methods can include, for example, driving techniques such as U-turns, driving in an
erratic manner either slow or fast, using indirect routes of travel, and/or traveling on roads with limited
vehicle traffic—all in an effort to attempt to identify if they are being followed.  I also know based on
my training and experience that drug traffickers may meet with their associates in secluded locations as
a method to limit law enforcement's ability to observe such meetings without being identified.  Drug
traffickers also often conduct drug transactions quickly when in public to limit their exposure to
potential law enforcement surveillance.

28.     Based on this training and experience, I believe that the behavior observed by law

enforcement agents prior to and during the meeting involving LUCIO-Castillo, PADILLA-Gutierrez, and RUIZ on April 30, 2020, along with each of these individuals' known history of drug involvement, was indicative of a drug transaction. As LUCIO-Castillo and PADILLA-Gutierrez did not make any observed obvious stops after departing 1130 California Street and meeting with RUIZ, I believe that LUCIO-Castillo and PADILLA-Gutierrez have stored drugs at 1130 California Street.

> **E.** **LUCIO-Castillo and PADILLA-Gutierrez Drive from 1130 California Street to Sell Heroin to CS2 and Return to 1130 California Street with Law Enforcement Funds on April 30, 2020**

29.     Meanwhile, on April 30, 2020, beginning at approximately 2:22 p.m., and at the direction of law enforcement agents, CS2 contacted telephone number 530-693-5849 to negotiate the anticipated purchase of approximately four ounces of heroin to occur later that same day. The female user of telephone number 530-693-5849, which is believed to be LUCIO-Castillo, agreed to meet and sell CS2 four "pieces" of heroin in Sutter County, California. These calls were recorded and conducted in the presence of law enforcement agents.

30.     Prior to meeting with LUCIO-Castillo, CS2 and CS2's vehicle were searched for contraband and weapons, with negative results. Law enforcement agents provided CS2 with a concealed recorder/transmitter. Agents also provided CS2 with $3,200 in law enforcement funds for the anticipated purchase of heroin. CS2 drove to the agreed upon meeting location, a public place on Encinal Road in Sutter County, CA. CS2 was followed by law enforcement agents as he/she drove to the meeting location.

31.     Agents also continued surveillance of 1130 California Street, where LUCIO-Castillo and PADILLA-Gutierrez had been seen exiting the aforementioned silver Honda Pilot earlier in the day. At approximately 4:46 p.m., two individuals, later identified by agents via driver's license photos as LUCIO-Castillo and PADILLA-Gutierrez, got into a blue Ford pick-up truck with CA LP: 6U24766 that was parked at 1130 California Street. Law enforcement agents continued surveillance on the blue Ford pick-up truck as it drove from 1130 California Street to the meeting location on Encinal Road. During this surveillance, agents noted that the blue Ford pick-up drove in a manner which I believe is consistent with conducting counter-surveillance; that is, the vehicle drove a rural route, it drove slower than the flow of traffic, and it pulled to the side of the road. This driving method was similar to the way the

silver Honda Pilot was driven earlier in the day during the suspected drug transaction.

32.     At approximately 5:15 p.m., agents observed the blue Ford pick-up truck arrive and park near CS2's vehicle at the agreed upon meeting location.  CS2 was observed meeting with the male driver and female passenger of the blue Ford pick-up truck.  Following this meeting, agents were able to verify based on observations and comparison to driver's license photos that the female in the blue Ford pick-up truck was LUCIO-Castillo and the male was PADILLA-Gutierrez.  During the interaction with LUCIO-Castillo and PADILLA-Gutierrez, CS2 purchased approximately 100 gross grams of what appeared to be heroin from LUCIO-Castillo and PADILLA-Gutierrez in exchange for the $3,200 in law enforcement funds.  The in-person interaction between LUCIO-Castillo, PADILLA-Gutierrez, and CS2 was monitored and recorded by law enforcement agents.  CS2 also discussed the potential for future drug transactions with LUCIO-Castillo and PADILLA-Gutierrez while they met in person.

33.     At approximately 5:18 p.m., after the drug exchange with CS2 was completed, LUCIO-Castillo and PADILLA-Gutierrez departed the meeting location in the blue Ford pick-up truck.  CS2 returned to CS2's vehicle and departed in the opposite direction of LUCIO-Castillo, monitored by law enforcement agents.

34.     Law enforcement agents continued to conduct surveillance of the blue Ford pick-up truck and noted it was driven directly from the meeting with CS2 to 1130 California Street, where LUCIO-Castillo and PADILLA-Gutierrez were observed walking towards the residence through the fence of the rear yard.  A short time later, surveillance of the blue Ford pick-up truck and LUCIO-Castillo and PADILLA-Gutierrez was suspended.

35.     Following the April 30, 2020, controlled purchase, law enforcement agents met with CS2 and recovered a clear plastic-wrapped package containing a substance which was later sent to the laboratory for testing.  This testing confirmed that the substance purchased from LUCIO-Castillo and PADILLA-Gutierrez on April 30, 2020 was heroin (net weight 100.0 g $\pm$ 0.2 g).  CS2 confirmed this plastic package contained the heroin purchased from LUCIO-Castillo and PADILLA-Gutierrez in exchange for $3,200 in law enforcement funds.  CS2 indicated to agents that during CS2's interaction with LUCIO-Castillo and PADILLA-Gutierrez, the three of them discussed the potential to conduct a future larger purchase of heroin as well as possibly methamphetamine.  However, LUCIO-Castillo

indicated that it was currently hard to acquire methamphetamine, and that the prices for methamphetamine were too high.  Law enforcement agents then recovered the recorder/transmitter from CS2, and CS2 and CS2's vehicle were again searched by agents for contraband and government funds, with negative results.

      F.      **Vehicle Tracker Shows LUCIO-Castillo and PADILLA-Gutierrez Leaving and Returning to 1130 California Street, While Conducting a Suspected Drug Deal on August 11, 2020**

      36.      On August 11, 2020, at approximately 5:35 p.m., vehicle tracker from a tracker that had previously been installed pursuant to an authorized search warrant indicated that the silver Honda Pilot was driving south from 1130 California Street on State Route 99, heading towards Sacramento.  At approximately 6:00 p.m., agents were able to establish visual surveillance on the silver Honda Pilot as it traveled southbound on CA-99 to Interstate 5, and exited at the Del Paso Road Exit.  At approximately 6:12 p.m., agents observed the silver Honda Pilot pull into the parking lot in front of In-N-Out Burger located at 2900 Advantage Way, Sacramento, CA 95834, which is the same location where agents previously have seen suspected drug transactions involving LUCIO-Castillo and PADILLA-Gutierrez occur.  Both LUCIO-Castillo and PADILLA-Gutierrez exited the vehicle and walked into the In-N-Out Burger, LUCIO-Castillo carrying a large purse.

      37.      At approximately 6:25 p.m., agents observed a white Ford Explorer with CA LP: F218R0, pull into the parking spot next to the silver Honda Pilot.  A few seconds later, LUCIO-Castillo emerged from the In-N-Out Burger with purse in hand.  LUCIO-Castillo then proceeded to get into the passenger seat of the white Ford Explorer and close the door.

      38.      Through the back window of the white Ford Explorer, I was able to make out the silhouette of a large object shaped like LUCIO-Castillo's purse being handed from LUCIO-Castillo to the driver, who was later identified as Jose Dolores FLORES.  A few moments later, I observed FLORES hand the object back to LUCIO-Castillo, who then got out of the white Ford Explorer holding the purse.  Per NET-5 Agent Sixto Torres, the purse appeared significantly bulkier than when LUCIO-Castillo had gotten into the vehicle.  At the same time, PADILLA-Gutierrez was observed walking out of the In-N-Out Burger carrying food.  LUCIO-Castillo and PADILLA-Gutierrez both returned to the silver Honda Pilot as the white Ford Explorer backed out of the spot.

39.     Agents observed both the silver Honda Pilot and the white Ford Explorer depart from the parking lot and maintained visual surveillance on the white Ford Explorer as it traveled south on Interstate 5.  At approximately 7:00 p.m., the white Ford Explorer was stopped for speeding by a marked California Highway Patrol ("CHP") vehicle on Interstate 5, just south of the exit for Eight Mile Road in Stockton, CA.  Officer Gregory Barker initiated contact with the driver, who was identified by his driver's license as Jose Dolores FLORES.  FLORES was the sole occupant of the vehicle.  Based upon the smell of alcohol combined with the driver's nervous behavior, Officer Barker obtained a consent to search the vehicle from FLORES.

40.     At this point, Officer P. Sutherland, who had arrived on scene to support Officer Barker, used a drug-detection canine to conduct a sniff of the vehicle.  This sniff resulted in a positive alert to the odor of narcotics.  Officer Sutherland subsequently conducted a search of the vehicle and found U.S. currency located in a plastic grocery bag inside of an open backpack.  FLORES denied knowledge and ownership of the U.S. currency, which was then seized by the CHP.   FLORES was issued a CHP receipt for the U.S. currency and released from the scene after the search was completed.  Upon returning to the Stockton Area CHP Office, a drug detection canine sniff test was conducted on the backpack containing the U.S. currency, and the canine gave a positive alert to the odor of narcotics.  The U.S. currency was subsequently transferred to DEA custody and was found to be $10,020.00 per an official count conducted by Loomis Bank personnel on August 14, 2020.

41.     The day after the vehicle stop occurred and the money was seized, FLORES's son, Estevan Miguel FLORES called the CHP and asked about getting the seized money, claiming that it belonged to him.  Estevan FLORES was directed to speak with Officer Barker and provided his contact phone number as 209-639-8227.  Per a court authorized pen register on LUCIO-Castillo's phone with the number 530-693-5849 (i.e., the number that LUCIO-Castillo has previously used to arrange drug transactions with CS2), there were two calls that evening between the phone number for LUCIO-Castillo and the phone number given by Estevan FLORES (209-639-8227).

42.     Based on my training and experience, I suspect this money to be the proceeds of a drug transaction which occurred between LUCIO-Castillo, PADILLA-Gutierrez, and FLORES.  As observed previously, LUCIO-Castillo and PADILLA-Gutierrez used the silver Honda Pilot to drive over an hour

south from 1130 California Street to the same parking lot with fast food restaurants in North Natomas that these targets have previously used to conduct suspected drug transactions, and it is conduct common among drug traffickers to drive long distances for a brief drug transaction before departing again. Based upon this, as well as the observed hand-to-hand transaction between LUCIO-Castillo and FLORES, I believe that FLORES departed from the parking lot with U.S. currency given to him by LUCIO-Castillo and PADILLA-Gutierrez in exchange for narcotics.

### G. One Kilogram of Heroin Seized from LUCIO-Castillo and PADILLA-Gutierrez after They Drove from 1130 California Street to PREMISES 2 on November 26, 2020

43.     On November 25, 2020, CS1 was in recorded telephonic contact with known heroin trafficker AISPURO-Quinonez. During the conversation, AISPURO-Quinonez asked CS1 to deliver a kilogram of heroin to an AISPURO-Quinonez customer known to CS1 as "Compa." "Compa" had been previously identified by CS1 and law enforcement agents as PADILLA-Gutierrez based upon photographs, physical observations, and telephone toll analysis. CS1 reached out to your affiant and was instructed to not accept the kilogram of heroin from AISPURO-Quinonez, and to try and delay the delivery until a later date. CS1 placed another recorded call to AISPURO-Quinonez to communicate this, at which point AISPURO-Quinonez indicated that it was urgent, and that PADILLA-Gutierrez would just drive down to Stockton, CA to pick up the kilogram of heroin at AISPURO-Quinonez's son's house. CS1 told law enforcement agents that AISPURO-Quinonez's son's house is located at 715 South Olive Ave., Stockton, CA (PREMISES 2). AISPURO-Quinonez's son had been previously identified by CS1 and law enforcement agents as Jesus Mateo AISPURO-PENA based upon photographs, physical observations, and telephone toll analysis.

44.     On November 20, 2020, this Court had authorized the continued monitoring of a tracking device that was previously installed pursuant to a vehicle tracking warrant on the silver Honda Pilot with CA LP: 6KHC268, which—as described above—had been used by LUCIO-Castillo and PADILLA-Gutierrez to deliver heroin in controlled buys and other suspected drug transactions. On November 26, 2020, at approximately 8:00 a.m.—i.e., the morning after CS1's call with AISPURO-Quinonez—agents observed that the vehicle tracker for the silver Honda Pilot showed that it was traveling from 1130 California Street southbound on highway CA-99.

45.     At approximately 8:26 a.m., the vehicle tracker showed that the silver Honda Pilot had stopped briefly right in front of PREMISES 2.  Though there is a lack of data between 8:27 a.m., and 8:46 p.m., by approximately 8:46 p.m., the vehicle had departed from South Olive Avenue.

46.     At approximately 9:05 a.m., a San Joaquin Sheriff Department (SJSD) Deputy observed that the silver Honda Pilot was speeding on Interstate CA-99 in violation of the California Vehicle Code and conducted an enforcement stop of the vehicle near the exit to Peltier Road.  Subsequent to the enforcement stop of the silver Honda Pilot, the SJSD Deputy identified the driver as LUCIO-Castillo and the passenger as PADILLA-Gutierrez based on their provided forms of identification.  The deputy also used a trained drug-detection canine to conduct a sniff around the exterior of the vehicle.  The trained drug-detection canine alerted to the odor of drugs in the silver Honda Pilot.

47.     SJSD deputies proceeded to conduct a search of the silver Honda Pilot and located a plastic bag containing a cereal box, within which was a hard, brown, tar-like substance wrapped in several layers of clear and black plastic.  This substance was field tested and showed a presumptive positive result for the presence of heroin.  Following the stop, this item was seized by the SJSD deputies and turned over to DEA custody on December 2, 2022.  The SJSD deputies cited and released LUCIO-Castillo and PADILLA- Gutierrez.

48.     After DEA took custody of the suspected heroin it was sent to the laboratory for analysis.  The DEA laboratory returned a report showing that the substance contained heroin and had a net weight of 1003.0 grams (+/- 1 gram).  Amounts and purity of the heroin present in the seized substance have not yet been analyzed.

49.     Based on my training and experience, it is common conduct among drug traffickers to drive long distances in order to pick up narcotics from a source of supply.  As evidenced by the recorded phone call between CS1 and AISPURO-Quinonez, it became apparent that LUCIO-Castillo and PADILLA-Gutierrez—drug traffickers and customers of AISPURO-Quinonez—would need to drive to Stockton, CA in order to pick up the heroin that they were requesting for distribution.  The vehicle tracker data clearly shows that on November 26, 2020, Thanksgiving morning, they drove approximately two hours south to PREMISES 2, before turning around and heading north again within twenty minutes of arriving.  While there was no direct observation on LUCIO-Castillo and PADILLA-

Gutierrez upon arriving at South Olive Avenue, based on the tracker location and the phone call the previous night, I believe that they stopped at PREMISES 2—the residence of AISPURO-PENA (AISPURO-Quinonez's son)—in order to pick up the 1 kilogram of heroin that law enforcement later found in their vehicle following the traffic stop on CA-99.

### H.   AISPURO-Quinonez Arranges the Sale of One Kilogram of Heroin, Delivered by MIRANDA, to CS1 and a UC in Los Angeles, CA, on March 2, 2021

50.   Law enforcement then arranged a controlled purchase of heroin from the AISPURO-Quinonez drug-trafficking organization (DTO) in Los Angeles, CA.  Prior to the controlled purchase, at the direction of the DEA, CS1 made recorded phone calls and text messages to AISPURO-Quinonez to ask about purchasing a kilogram of heroin in Los Angeles, California, for $15,300.00.  On March 1, 2021, AISPURO-Quinonez provided CS1 via text with a phone number for the courier who would deliver the heroin.  AISPURO-Quinonez also told CS1 that the courier was one of two who operated a stash house on behalf of AISPURO-Quinonez's brother, Jose FIDEL AISPURO-Quinonez.  This courier was the daytime courier, while another courier worked at night.

51.   On this same date, CS1 proceeded to contact the courier via recorded phone calls and text messages to arrange for the delivery of the heroin.  On March 2, 2021, the courier agreed to meet with CS1 and a NET-5 agent acting in an undercover (UC) capacity in a parking lot located at 6821 Eastern Ave., Bell Gardens, CA, 90201, which is in the Central District of California.

52.   On March 2, 2021, both before and after the meeting with AISPURO-Quinonez's drug courier, CS1 and CS1's vehicle were searched for contraband and weapons, with negative results.  Law enforcement agents provided the UC with a concealed recorder/transmitter and $15,300.00 in law enforcement funds for the anticipated purchase of heroin.  The UC and CS1 subsequently drove to the agreed upon meeting location, escorted by agents.

53.   At approximately 11:55 p.m., CS1 contacted the courier, who told CS1 that he was driving a white vehicle and that he could walk over to CS1's vehicle.  A few minutes later, law enforcement agents observed a Hispanic male carrying a white plastic Target bag walk toward CS1's vehicle and get inside.

54.   According to CS1, the courier provided CS1 with the white plastic bag containing

approximately one kilogram of suspected heroin wrapped in black tape.  CS1 then handed the courier $15,300.00 in law enforcement funds wrapped in rubber bands, which were placed in the white plastic bag.  After approximately one minute, law enforcement agents observed the courier get back out of CS1's vehicle with the white plastic Target bag and walk to a white Volkswagen Hatchback with CA LP: 8NOR579.  The courier proceeded to get inside and depart the area, followed by agents.

55.     At approximately 12:13 p.m., law enforcement agents observed the courier pull into an Auto Spa Car Wash in the vicinity of Eastern Avenue in Bell Gardens, CA.  After departing this location, the courier was then observed at approximately 12:37 p.m., parking the white Volkswagen Hatchback in the vicinity of 8059 Park Ln, Bell Gardens, CA.  The courier proceeded to get out of the vehicle with the white plastic Target bag and enter a gray Toyota Tacoma with CA LP: 48440C3.  Law enforcement agents continued to surveil the courier and follow this new vehicle.

56.     At approximately 12:45 p.m., law enforcement agents observed the courier parking in the vicinity of 5516 Gotham Street, Bell Gardens, CA, and then entering the residence located at this address.  Five minutes later, surveillance was terminated.

57.     Based on my training and experience, as well as conversations with more experienced agents, it is common conduct among drug traffickers to utilize counter-surveillance techniques before and after a drug deal in order to avoid detection by law enforcement.  This can include stopping at multiple locations and switching vehicles, as observed on March 2, 2021.

58.     Immediately after the March 2, 2021 controlled purchase, law enforcement agents met with CS1 and the UC and took custody of the plastic bag containing a substance wrapped in black plastic tape.  Agents cut open the black plastic tape to observe the hard brown substance inside, which, based upon my training and experience, as well as conversations with more experienced agents, appeared to be consistent with heroin.  Though it was not field tested, the suspected heroin was sent to the laboratory for analysis.  The DEA laboratory returned a report showing that the substance contained heroin and had a net weight of 981.1 grams (+/- 0.2 grams).  The substance had a purity of 34% (+/- 4%), indicating that the amount of pure heroin was 333.5 grams (+/- 37.8g).

59.     After the controlled purchase was completed, agents conducting surveillance were able to identify the courier who met with CS1 and the UC as Ismael MIRANDA based upon vehicle registration

information and information obtained from law enforcement databases.  A driver's license photograph of MIRANDA was shown to CS1 who stated that "yes," it was the courier.   A driver's license photograph of MIRANDA was shown to the UC who stated that though the eyes looked the same it was difficult to tell, as the courier was wearing a lower face mask and hat.

60.    Law enforcement then conducted additional investigation into the identify of AISPURO-Quinonez's courier.  For example, a commercial database query for the address 5516 Gotham Street, Bell Gardens, CA, associates this address with MIRANDA based upon credit reporting from 2011 to 2022.  Furthermore, on July 14, 2022, MIRANDA was arrested by the Bell Gardens Police Department (BGPD) on a state charge of inflicting corporal injury on a spouse/cohabitant.  MIRANDA was later released.  I subsequently contacted the arresting BGPD Officer, Ruben Catani, who informed me that he was familiar with MIRANDA, and that he knew that MIRANDA resided at 5516 Gotham Street, Bell Gardens, CA—i.e., the same residence that MIRANDA entered following the controlled purchase of heroin on March 2, 2021.

**I.    AISPURO-Quinonez Arranges the Sale of One Kilogram of Heroin, Delivered by CASTELO-Garcia, to a UC in Los Angeles, CA, on September 13, 2021**

61.    In September 2021, at the direction of the DEA, CS1 made recorded phone calls and text messages to AISPURO-Quinonez to ask about purchasing a kilogram of heroin in Los Angeles, California, for $15,500.00.  This was a ruse for a controlled purchase designed to allow a NET-5 agent, acting in a UC capacity, to purchase the heroin with law enforcement funds.  AISPURO-Quinonez told CS1 that he would need to speak with his brother, Jose FIDEL AISPURO-Quinonez, who operated in Los Angeles.  On September 12, 2021, AISPURO-Quinonez confirmed with CS1 that there would be a kilogram of heroin available the following day.

62.    That evening, AISPURO-Quinonez sent a text message to CS1 with the phone number for the courier who would deliver the heroin.  CS1 subsequently called the courier, and they agreed that the UC and the courier could meet the next morning.  The courier told CS1 that he would send the meeting location at approximately 10:00 a.m. the following day.

63.    On September 13, 2021, the courier sent a text message to CS1 with the address 2560 N. Perris Boulevard, Perris California 92571, a shopping center parking lot.  At the direction of agents, CS1

placed a recorded phone call to the courier and asked if the courier's phone number could be passed to the UC.  The courier agreed, and the UC subsequently placed a call to the courier in order to discuss a potentially different meeting location.  The courier refused to change locations, so the UC agreed to meet at the proposed parking lot at approximately 11:30 a.m.

64.     Law enforcement agents provided the UC with a concealed recorder/transmitter and $15,500.00 in law enforcement funds for the anticipated purchase of heroin.  Agents followed the UC to the agreed upon meeting location.  When the UC arrived, the UC called the courier, who indicated that he was eating at a nearby restaurant and to meet him there.  The UC declined, and the courier agreed to come to the originally proposed meeting location.

65.     When the courier arrived in the parking lot, he contacted the UC and was wearing a yellow t-shirt, skinny jeans, and flip flops.  After seeing the UC, the courier got back into a dark grey Honda Accord with CA LP: 7YWA281, and parked closer to the UC's vehicle.  The courier then asked the UC to come to his vehicle.

66.     The UC walked to the courier's grey Honda Accord.  Once the UC was at the vehicle, the courier indicated that the UC should take the purple paper Metro PCS bag located behind the front passenger seat.  The UC stated that the purple paper Metro PCS bag contained the suspected heroin.  The UC picked up the bag, and both the UC and the courier returned to the UC's vehicle, where the UC provided the courier with $15,500 in law enforcement funds.  The UC indicated that the courier did not count the money.  The courier told CS1 that he had been robbed and shot before during a deal and that was why he had acted so adamantly about meeting in this specific area.  At this point, the courier returned to the dark grey Honda Accord and left the parking lot.

67.     Agents continued surveillance on the dark grey Honda Accord as it departed.  At approximately 12:16 p.m., the Honda Accord was observed parking in the driveway of a residence located at 2450 Wilson Avenue, Perris, CA.  The courier was observed getting out of the vehicle and walking into the residence.  Surveillance was ended on the courier and the dark grey Honda Accord at approximately 1:30 p.m.

68.     Immediately after the September 13, 2021 controlled purchase, law enforcement agents met with the UC and took custody of the purple paper Metro PCS bag containing the approximately one

kilogram of suspected heroin.  The suspected heroin was wrapped in clear and black tape.  Though it was not field tested, the suspected heroin was sent to the laboratory for analysis.  The DEA laboratory returned a report showing that the substance contained heroin and had a net weight of 996.1 grams (+/- 0.2 grams).  The substance had a purity of 49% (+/- 5%), indicating that the amount of pure heroin was 488.0 grams (+/- 46.2g).

69.     After the controlled purchase was completed, a search of law enforcement databases provided agents with Mexican identification cards for the registered owner of the dark grey Honda Accord with CA LP: 7YWA281:  Gilberto CASTELO-Garcia.  Agents subsequently provided copies of the photographs from these identification cards, as well as a photo from CASTELO-Garcia's Facebook page to the UC, who confirmed that CASTELO-Garcia was the courier who delivered the heroin.

70.     Law enforcement agents subsequently obtained court authorized global positioning satellite (GPS) location data for the cell phone used by CASTELO-Garcia, from the Honorable Sheri Pym of the Central District of California, for the period of October 7, 2021 until November 6, 2021. Utilizing the GPS location data for the cell phone, law enforcement agents conducted surveillance on CASTELO-Garcia and observed his dark grey Honda Accord parked at 2450 Wilson Avenue, Perris, CA.  The GPS location data—though not overly precise—routinely placed CASTELO-Garcia in the general area of this address.  Additionally, law enforcement agents placed a ruse phone call to the phone number given to the UC and observed CASTELO-Garcia answer the phone.

**J.      AISPURO-PENA Sells Heroin to CS1 and Drives Law Enforcement Funds to PREMISES 3 on February 18, 2022**

71.     Utilizing CS1, agents conducted a controlled purchase for four ounces of heroin from the AISPURO-Quinonez DTO on February 18, 2022.  At the direction of agents, CS1 arranged for the controlled purchase via recorded phone calls and text messages with AISPURO-Quinonez.  During these calls, APISPURO-Quinonez indicated that his son, Jesus Mateo AISPURO-PENA would be the one who delivered the heroin.

72.     On February 18, 2022, both before and after the meeting with AISUPURO-Quinonez, CS1 and CS1's vehicle were searched for contraband and weapons, with negative results.  Law enforcement agents provided CS1 with a concealed recorder/transmitter.  Agents provided CS1 with

$1,600.00 in law enforcement funds for the anticipated purchase of heroin.  CS1 subsequently drove to the agreed upon meeting location, escorted by agents.

73.     At approximately 11:50 a.m., agents observed a silver Toyota Tacoma with CA LP: 8P82419 arrive at the meeting location and park next to CS1's vehicle.  AISPURO-PENA got out of the silver Toyota Tacoma and got into the passenger seat of CS1' vehicle.

74.     According to CS1, AISPURO-PENA gave CS1 the suspected heroin in a clear vacuum-sealed package.  CS1 then gave AISPURO-PENA the $1,600.00 in law enforcement funds and asked him to count it.  AISPURO-PENA didn't know how much money it was supposed to be, so CS1 told him $1,600.00 and AISPURO-PENA proceeded to count the money.

75.     CS1 indicated that AISPURO-PENA said he was currently living with his mother-in-law and that he couldn't keep drugs at her house.  Prior to the controlled purchase, AISPURO-PENA stated that he had obtained the drugs from the trafficker "Julio" and had then driven them to a residence belonging to "Cosala," where he picked them up before driving to meet CS1.  According to CS1, "Cosala" lives at 2557 Somerset St., Stockton, CA, and used to work for AISPURO-Quinonez years ago, but they had a falling out over money that "Cosala" owed to AISPURO-Quinonez.

76.     At approximately 11:52 a.m., agents observed AISPURO-PENA get out of CS1's vehicle and re-enter the silver Toyota Tacoma, departing the parking lot followed by agents.  Three minutes later, agents followed CS1 back to a neutral location.

77.     At approximately 12:03 p.m., agents observed the silver Toyota Tacoma park outside PREMISES 3.  Surveillance was terminated at approximately 12:35 p.m., when there was no sign of AISPURO-PENA returning to the vehicle.

78.     Following the February 18, 2022 controlled purchase, law enforcement agents met with CS1 and recovered a vacuum-sealed clear plastic bag containing the approximately 4 ounces of suspected heroin.  Agents observed that inside the vacuum-sealed clear plastic bag was a brown, hard substance, which—based on my training and experience, as well as conversations with more experienced agents—appeared to be heroin.  Though it was not field tested, the suspected heroin was sent to the laboratory for analysis.  The DEA laboratory returned a report showing that the substance contained heroin and had a net weight of 101.8 grams (+/- 0.2 grams).  Amounts and purity of the heroin

present in the seized substance have not yet been analyzed.

**K.     AISPURO-PENA Drives Directly from PREMISES 3 with Heroin to Sell to CS1 on March 25, 2022 and Returns with Law Enforcement Funds to PREMISES 1**

79.     Utilizing CS1, agents conducted another controlled purchase for four ounces of heroin from the AISPURO-Quinonez DTO on March 25, 2022.  At the direction of agents, between February 23, 2022, and March 25, 2022, CS1 arranged for the controlled purchase via recorded phone calls and text messages with AISPURO-Quinonez.  During these calls, AISPURO-Quinonez indicated that his son, AISPURO-PENA would be the one who delivered the heroin.

80.     On March 25, 2022, both before and after the meeting with AISPURO-PENA, CS1 and CS1's vehicle were searched for contraband and weapons, with negative results.  Law enforcement agents provided CS1 with a concealed recorder/transmitter.  Agents provided CS1 with $1,600.00 in law enforcement funds for the anticipated purchase of heroin.  CS1 subsequently drove to the agreed upon meeting location, escorted by agents.

81.     At approximately 10:42 a.m., agents observed AISPURO-PENA exit the residence located at PREMISES 3, and enter a silver Toyota Tacoma with CA LP: 8P82419, and depart the residence followed by agents.

82.     At approximately 10:54 a.m., agents observed the silver Toyota Tacoma enter the parking lot at the meeting location.  AISPURO-PENA was observed getting out of the vehicle, approaching a nearby taco truck, and using his cell phone before returning his vehicle.  Approximately half an hour later, CS1 arrived and parked at the meeting location, escorted by agents.  Agents observed AISPURO-PENA get back out of the silver Toyota Tacoma and enter CS1's vehicle.

83.     According to CS1, CS1 told AISPURO-PENA that AISPURO-Quinonez was not answering the phone that morning, and AISPURO-PENA stated that he had not been able to get in touch with AISPURO-Quinonez either—likely due to the fact that AISPURO-Quinonez had been partying the night before at his ranch in Mexico for his brother's birthday.  (As described above, AISPURO-Quinonez's brother is Jose FIDEL AISPURO-Quinonez).

84.     CS1 told agents that AISPURO-PENA gave CS1 the suspected heroin in a white plastic bag, and, in turn, CS1 provided AISPURO-PENA the $1,600.00 in law enforcement funds, and

AISPURO-PENA counted it.  CS1 stated that AISPURO-PENA did not know exactly how much money it should be, just that he was to sell the four ounces of heroin to CS1.

85.     AISPURO-PENA also informed CS1 that AISPURO-Quinonez was likely to stay in Mexico for a while longer now that business was going well in Stockton.  CS1 indicated that AISPURO-PENA had driven the night before to Modesto, CA, to pick up the four ounces of suspected heroin from the residence of the drug trafficker known as "Julio."  AISPURO-PENA stated that there were an additional 11 ounces of heroin (either still located at Julio's residence or picked up already) that were available for sale.

86.     After the meeting concluded, at approximately 11:24 a.m., agents observed AISPURO-PENA get out of CS1's vehicle and return to the silver Toyota Tacoma.  Subsequently, both CS1 and AISPURO-PENA departed the meeting location in their separate vehicles.  Law enforcement agents followed CS1 back to a neutral location.

87.     Agents continued to conduct surveillance on the silver Toyota Tacoma, though surveillance was briefly lost.  At approximately 11:41 a.m., surveillance was re-established on the silver Toyota Tacoma, which was parked at PREMISES 1.  Nothing further was seen of AISPURO-PENA, and the surveillance was terminated.

88.     Following the March 25, 2022 controlled purchase, law enforcement agents met with CS1 and recovered a vacuum-sealed clear plastic bag containing the approximately 4 ounces of suspected heroin.  Agents observed that inside the vacuum-sealed clear plastic bag was a brown, hard substance, which—based on my training and experience, as well as conversations with more experienced agents—appeared to be heroin.  Though it was not field tested, the suspected heroin was sent to the laboratory for analysis.  The DEA laboratory returned a report showing that the substance contained heroin and had a net weight of 100.8 grams (+/- 0.2 grams).  Amounts and purity of the heroin present in the seized substance have not yet been analyzed.

**L.     CARDENAS Sells Heroin to CS1 and Drives Law Enforcement Funds to PREMISES 4 on April 27, 2022**

89.     Utilizing CS1, agents conducted another controlled purchase for four ounces of heroin from the AISPURO-Quinonez DTO on April 27, 2022.  At the direction of agents, between March 26,

2022, and April 27, 2022, CS1 arranged for the controlled purchase via recorded phone calls and text messages with AISPURO-Quinonez.  During these calls, APISPURO-Quinonez indicated that an individual he referred to as "Primo" might be delivering the heroin instead of his son, AISPURO-PENA. As described later in this affidavit, agents have identified Primo as Daniel CARDENAS.

90.     On April 27, 2022, both before and after the meeting with Daniel CARDENAS, CS1 and CS1's vehicle were searched for contraband and weapons, with negative results.  Law enforcement agents provided CS1 with a concealed recorder/transmitter.  Agents provided CS1 with $1,600.00 in law enforcement funds for the anticipated purchase of heroin.  CS1 subsequently drove to the agreed upon meeting location, escorted by agents.

91.     At approximately 10:30 a.m., law enforcement agents established surveillance at PREMISES 2 in anticipation of a planned controlled purchase to occur later that day.  (Though this controlled purchase was arranged by AISPURO-Quinonez, neither he nor AISPURO-PENA were present at the controlled purchase.)  At approximately 11:09 a.m., the silver Toyota Tacoma with CA LP: 8P82419, which had previously been used by AISPURO-Quinonez and AISPURO-PENA, was observed leaving PREMISES 2.  Law enforcement agents continued to surveil the vehicle and later observed AISPURO-PENA to be the driver.  Though no criminal activity was observed during the surveillance on AISPURO-PENA, this event demonstrates that the silver Toyota Tacoma would be parked at PREMISES 2, and that AISPURO-PENA was present there at the same time.  Surveillance was ended on AISPURO-PENA at approximately 12:00 p.m.

92.     At approximately 12:30 p.m., CS1 arrived at the meeting location and parked CS1's vehicle, escorted by law enforcement agents.  Fifteen minutes later, law enforcement agents observed a red Toyota Prius with CA LP: RYDJD21 arrive at the meeting location and park next to CS1's vehicle. The driver, later identified by agents as CARDENAS, exited the red Toyota Prius and got into the passenger seat of CS1's vehicle.

93.     According to CS1, CARDENAS was not alone; there was a woman in the passenger seat of the red Toyota Prius, though she remained in the vehicle.  CS1 told investigators that CARDENAS told CS1 that he had come from the flea market area, south of Stockton.  CARDENAS then provided CS1 with the suspected heroin in a clear plastic bag and, in turn, CS1 provided CARDENAS the

$1,600.00 in law enforcement funds, which CARDENAS counted.  CS1 stated that CARDENAS did not know exactly how much money it should be, and CS1 informed him it was supposed to be $1,600.00.

94.     After the meeting concluded, at approximately 12:47 p.m., law enforcement agents observed CARDENAS return to the red Toyota Prius and depart the parking lot.  A few minutes later, law enforcement agents followed CS1 back to a neutral location.

95.     Surveillance was lost on CARDENAS after he departed the parking lot for approximately eight minutes; however, surveillance was re-established, and at approximately 1:05 p.m., CARDENAS was observed stopping at the Apex Academy, a school located at 444 N. American St., Stockton, CA. After CARDENAS departed, surveillance was again lost until 1:30 p.m., when law enforcement agents observed the red Toyota Prius pulling out of the driveway of PREMISES 4.  This is the residence that was listed on the vehicle's registration.  Law enforcement agents observed that the driver of the red Toyota Prius was now a female.  There was no further sign of CARDENAS and surveillance was terminated at approximately 1:52 p.m.

96.     Following the April 27, 2022 controlled purchase, law enforcement agents met with CS1 and recovered a clear plastic bag containing the approximately 4 ounces of suspected heroin.  Agents observed that inside the clear plastic bag was a brown, hard substance, which—based on my training and experience, as well as conversations with more experienced agents—appeared to be heroin.  Though it was not field tested, the suspected heroin was sent to the laboratory for analysis.  The DEA laboratory returned a report showing that the substance contained heroin and had a net weight of 100.2 grams (+/- 0.2 grams).  The substance had a purity of 53% (+/- 5%) and thus contained 53.1 grams (+/- 4.9 grams) of pure heroin.

### M.     CARDENAS and AISPURO-Quinonez Sell Heroin to CS1 and Drive Law Enforcement Funds to PREMISES 1, on June 7, 2022

97.     Utilizing CS1, agents conducted another controlled purchase for four ounces of heroin from the AISPURO-Quinonez DTO on June 7, 2022.  At the direction of agents, between June 5, 2022, and June 7, 2022, CS1 arranged for the controlled purchase via recorded phone calls and text messages with AISPURO-Quinonez.  On the morning of June 7, 2022, CS1 texted AISPURO-Quinonez regarding the purchase of the heroin, and AISPURO-Quinonez informed CS1 that he did not currently have a

vehicle.  After some time passed, CS1 again reached out, and AISPURO-Quinonez told CS1 that he would be getting another individual to drive him to the agreed upon meeting location.

98.     On June 7, 2022, both before and after the meeting with AISUPURO-Quinonez, CS1 and CS1's vehicle were searched for contraband and weapons, with negative results.  Law enforcement agents provided CS1 with a concealed recorder/transmitter.  Agents provided CS1 with $1,600.00 in law enforcement funds for the anticipated purchase of heroin.  CS1 subsequently drove to the agreed upon meeting location, escorted by agents.

99.     CS1 was the first to arrive at the meeting location.  At approximately 12:13 p.m., agents observed a white Kia Forte with CA LP: 8TAX443, arrive at the meet location and park in the stall directly to the right of CS1's vehicle.  Agents observed AISPURO-Quinonez get out of the passenger seat of the white Kia Forte and get into CS1's vehicle.  Agents also observed the driver of the white Kia Forte get out of the vehicle.  The driver was a Hispanic adult male wearing a blue shirt and grey shorts, identified by CS1 as "Primo," the same person who had previously delivered the heroin to CS1 on April 27, 2022.  Based on a driver's license photograph, agents identified "Primo" as Daniel CARDENAS. This assessment was corroborated by CS1, who was shown a photograph of CARDENAS with no additional markings.

100.    According to CS1, AISPURO-Quinonez told CS1 that his son, AISPURO-PENA, was currently out driving the silver Toyota Tacoma, and that is why he did not have a vehicle today. AISPURO-Quinonez also indicated that he was staying with his sister and brother-in-law.  CS1 stated that it was likely AISPURO-Quinonez spent the days at his sister's house, PREMISES 1, as she was an excellent cook, but that AISPURO-Quinonez was likely sleeping at the same address as his son, PREMISES 2.

101.    CS1 stated that AISPURO-Quinonez had previously told CS1 that his cousin was selling methamphetamine from Sinaloa, Mexico, so CS1 inquired about the price.  AISPURO-Quinonez informed CS1 that it was $900.00 for one pound, but that the quality was not very good, and the crystals broke apart easily.  CS1 told agents that he believed the driver, "Primo," to be involved in procuring the methamphetamine on AISPURO-Quinonez's behalf.  After they had conversed for some time, AISPURO-Quinonez provided CS1 the heroin in a black plastic bag, and CS1 then gave AISPURO-

Quinonez the $1,600.00 in law enforcement funds, which AISPURO-Quinonez did not count.

102.     At approximately 12:24 p.m., agents observed AISPURO-Quinonez getting out of CS1's vehicle and walking over to a nearby taco truck to meet with "Primo."  Both were subsequently observed returning to the white Kia Forte, which departed the meeting location.  After the meeting concluded, law enforcement agents followed CS1 back to a neutral location.

103.     Agents continued to conduct surveillance on the white Kia Forte and observed it driving to S. David Avenue and saw the vehicle park outside of PREMISES 1.  Agents observed AISPURO-Quinonez exit the vehicle and enter PREMISES 1.  Approximately twenty minutes later, the white Kia Forte was observed departing PREMISES 1 and was followed to PREMISES 4.

104.     Following the June 7, 2022 controlled purchase, law enforcement agents met with CS1 and recovered a black plastic bag containing the approximately 4 ounces of suspected heroin.  Agents observed that inside the black bag was a brown, hard substance, which—based on my training and experience, as well as conversations with more experienced agents—appeared to be heroin.  Though it was not field tested, the suspected heroin was sent to the laboratory for analysis.  The DEA laboratory returned a report showing that the substance contained the following:  O6-Monoacetylmorphine (an active metabolite in heroin), N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl]propanamide (Fentanyl), and heroin.  Amounts and purity of each chemical present in the seized substance have not yet been analyzed.

### N.     AISPURO-Quinonez Drives Directly from PREMISES 1, with Methamphetamine to Sell to CS1 on June 22, 2022 and Returns with Law Enforcement Funds to PREMISES 1

105.     Utilizing CS1, agents conducted another controlled purchase for one pound of methamphetamine from the AISPURO-Quinonez DTO on June 22, 2022.  At the direction of agents, between June 20, 2022, and June 22, 2022, CS1 arranged for the controlled purchase via recorded phone calls and text messages with AISPURO-Quinonez.  During these communications, AISPURO-Quinonez indicated that he would personally deliver the methamphetamine to CS1.

106.     On June 22, 2022, both before and after the meeting with AISPURO-Quinonez, CS1 and CS1's vehicle were searched for contraband and weapons, with negative results.  Law enforcement agents provided CS1 with a concealed recorder/transmitter.  Agents provided CS1 with $900.00 in law

enforcement funds for the anticipated purchase of methamphetamine.  CS1 subsequently drove to the agreed upon meeting location, escorted by agents.

107.    On this same day, at approximately 11:05 a.m., CS1 contacted AISPURO-Quinonez via a recorded call regarding the purchase of one pound of methamphetamine, and AISPURO-Quinonez stated that he did not have any available.  Approximately 20 minutes later, AISPURO-Quinonez told CS1 that he had found some methamphetamine, but requested an additional $50.00 from CS1 for gas money.  CS1 told AISUPURO-Quinonez that CS1 could not pay an extra $50.00 now, but would pay AISPURO-Quinonez an additional $50.00 the next time CS1 purchased drugs from AISPURO-Quinonez.

108.    At approximately 11:30 a.m., surveillance was established by law enforcement agents at PREMISES 1.  Ten minutes later, a silver Toyota Tacoma with CA LP: 8P82419 (a vehicle previously known by agents to be used by AISPURO-Quinonez) arrived at PREMISES 1 and was observed parked under the car port.  Fifteen minutes after that, the silver Toyota Tacoma was observed departing PREMISES 1 and was followed by law enforcement agents.

109.    At approximately 12:44 p.m., the silver Toyota Tacoma was observed arriving at the meeting location.  The driver of the vehicle got out and was identified as AISPURO-Quinonez.  A younger Hispanic male also exited the passenger side of the vehicle and was later identified as AISPURO-Quinonez's son, AISPURO-PENA.  A minute later, CS1's vehicle pulled into the meeting location, escorted by law enforcement agents.  AISPURO-Quinonez proceeded to get into the passenger seat of CS1's vehicle.

110.    According to CS1, AISPURO-Quinonez had picked up the methamphetamine just prior to the meeting.  AISPURO-Quinonez handed the methamphetamine to CS1 inside a Ziploc bag, which was contained in a plastic shopping bag.  CS1 then gave AISPURO-Quinonez the $900.00 in law enforcement funds, which AISPURO-Quinonez did not count.  After conducting the transaction, AISPURO-Quinonez informed CS1 that a shipment of methamphetamine should arrive between June 23 and June 24, 2022.  AISPURO-Quinonez also stated that he was going to start distributing cocaine, and currently had 2 kilograms of cocaine available, though CS1 did not know where it was located.

111.    CS1 also indicated that AISPURO-Quinonez claimed to have pills for sale and an

associate who was currently in possession of several kilograms of heroin.  CS1 stated that according to AISPURO-Quinonez, the friend has only sold two of the ten kilograms of heroin he had because of the high demand for pills.  This high demand for pills was also the reason AISPURO-Quinonez was diversifying into the cocaine market.

112.    At approximately 12:50 p.m., law enforcement agents observed AISPURO-Quinonez exit CS1's vehicle and return to the silver Toyota Tacoma, along with his son, AISPURO-PENA.  They then proceeded to depart from the meeting location and were surveilled by law enforcement agents as they returned to PREMISES 1 and parked out front.  At approximately 1:18 p.m., surveillance was terminated on the silver Toyota Tacoma and AISPURO-Quinonez.

113.    After the meeting concluded, law enforcement agents followed CS1 back to a neutral location.  Law enforcement agents then met with CS1 and recovered a plastic shopping bag containing a Ziploc bag with approximately one pound of suspected crystal methamphetamine inside it.  Agents observed that inside the Ziploc bag was a clear rock like substance comprised of both crystal shards and powder, which—based on my training and experience, as well as conversations with more experienced agents—appeared to be crystal methamphetamine.  Though it was not field tested, the suspected methamphetamine was sent to the laboratory for analysis and agents are currently awaiting results.

**O.    AISPURO-Quinonez's Family Members Potentially Move from PREMISES 1 to 734 North Windsor Avenue, Stockton, CA**

114.    As evidenced by the multiple controlled purchases described above, law enforcement agents have observed AISPURO-Quinonez depart directly from PREMISES 1 while en route to sell methamphetamine to CS1.  Law enforcement agents have also observed AISPURO-Quinonez and AISPURO-PENA return to PREMISES 1 with law enforcement funds after selling heroin to CS1.  Though not the primary residence of AISPURO-Quinonez, PREMISES 1 was the primary residence for AISPURO-Quinonez's sister, Leticia Aispuro Quinonez, and her paramour, Victor Lenin Rios Beltran.[4]  CS1 indicated that AISPURO-Quinonez spent much of his time at PREMISES 1 and has informed

---

[4] Per CS1 reporting, Leticia Aispuro Quinonez and Victor Lenin Rios Beltran are married, but commercial database queries do not show that there is evidence of an actual marriage certificate.  It is possible that they are instead in a long-term intimate relationship but not officially married or were married in Mexico.

agents numerous times that AISPURO-Quinonez has stayed at PREMISES 1 as a residence over the course of the investigation.  Furthermore, a commercial database query associates AISPURO-Quinonez with this address from 2007 to 2020 based on Experian credit reporting.

115.    However, it appears that sometime between April 2022 and September 2022, Leticia Aispuro Quinonez acquired a new residence, 734 North Windsor Avenue, Stockton, CA.  A commercial database query of this new residence shows that there was a San Joaquin County deed transfer as of April 19, 2022, from the seller Jose Hernandez, to the buyer, "Leticia A Quinonez."  The same query results associate the address with Leticia Aispuro Quinonez on June 14, 2022, from a source identified as "New Movers."  Credit reporting also associates Leticia Aispuro Quinonez with 734 North Windsor Avenue, as of May 31, 2022.  A search of the real estate websites Zillow.com and Redfin.com also shows that 734 North Windsor Avenue was sold as of May 2022.

116.    While there is no deed transfer or sale information for this residence, it is possible that Leticia Aispuro Quinonez did not own PREMISES 1, but was merely renting the location.  A commercial database query of PREMISES 1, associates the residence with Laura Meraz as of March 2022, based upon Equifax credit reporting.  She was previously linked to PREMISES 1 via household listing from 2018 to 2019 and in 2010 through TransUnion credit reporting.  The same commercial database query, though the source of the data is unclear, lists the following individuals as associates of Laura Meraz:  AISPURO-Quinonez, Victor Lenin Rios Beltran, Leticia Aispuro Quinonez, and Rosalva Pena Aispuro.

117.    On September 8, 2022, law enforcement agents conducted an address check of PREMISES 1.  Parked outside the mobile home were three vehicles that had not previously been seen by law enforcement at this location.  This included a light tan Honda with no rear CA LP parked in Space 18's car port, a white Ford sport utility vehicle with no front LP, and a 2008 Chevrolet Tahoe with CA LP: 6CSU419.  Department of Motor Vehicle (DMV) records linked this last vehicle to a salvaged title with the name Agustin Circunvalacion and a release of liability for March 28, 2015.  An additional address check the following week by a law enforcement agent again identified that the light tan Honda was parked in Space 18's car port.

118.    On September 26, 2022, law enforcement agents conducted surveillance on PREMISES

1.  At approximately 11:22 a.m., agents observed a white Toyota Tacoma with CA LP: 94852N2, parked at PREMISES 1.  DMV records show that this vehicle is registered to "Victor Beltran" at PREMISES 1.

119.    On October 3, 2022, law enforcement agents conduced surveillance on PREMISES 1.  At approximately 2:12 p.m., law enforcement agents observed the aforementioned silver Toyota Tacoma with CA LP: 8P82419 (which is a vehicle used by AISPURO-Quinonez and AISPURO-Pena to conduct drug trafficking activities on several occasions in the past) arrive at PREMISES 1 and park in front of Space 18.  Two Hispanic males were observed walking toward the door under Space 18's car port, and the silver Toyota Tacoma was seen to be empty.  Approximately fifteen minutes later, the silver Toyota Tacoma was observed departing from PREMISES 1 and was followed by law enforcement agents as it drove to Michael's Market, a nearby store.  Based on a driver's license photograph, law enforcement agents identified the driver as AISPURO-PENA as he got out of the vehicle; however, the passenger was not observed well enough to be identified.

120.    Approximately seven minutes later, AISPURO-PENA and the unidentified passenger returned to the silver Toyota Tacoma and were surveilled as they returned to PREMISES 1, again parking in front of Space 18.  Law enforcement agents observed that the silver Toyota Tacoma was empty, and one Hispanic male was observed walking under the car port near the door to PREMISES 1.  At approximately 3:12 p.m., the silver Toyota Tacoma was observed departing from PREMISES 1 and was followed by law enforcement agents as it drove to PREMISES 2, where it pulled into the garage.  At this point, surveillance was terminated.

121.    Based upon these observations by agents on October 3, 2022, it is clear that AISPURO-PENA continues to visit PREMISES 1 using the silver Toyota Tacoma that he has used in past drug transactions, and that he is visiting PREMISES 1 in the same manner as occurred prior to Leticia Aispuro Quinonez acquiring 734 North Windsor Avenue.  Based on my training and experience, and based on law enforcement observations of the use of PREMISES 1 for drug-trafficking purposes on several occasions in the past, I believe that AISPURO-PENA and AISPURO-Quinonez are still utilizing PREMISES 1 as a location to store narcotics.  Similarly, these observations confirm law enforcement's other information establishing that AISPURO-PENA continues to reside at PREMISES 2 (which—in addition to being a known drug-trafficker's residence—was the location that LUCIO-Castillo and

PADILLA-Gutierrez traveled to in order to pickup 1 KG of heroin in November 2020).

122.     Furthermore, while it is unclear who currently resides at PREMISES 1, based on telephone call analysis, as of September 13, 2022, AISPURO-Quinonez likely remains in contact with Victor Lenin Rios Beltran, whose vehicle has been observed parked at PREMISES 1 in the last several weeks.  CS1 reporting—corroborated by recorded calls and communications—gives AISPURO-Quinonez's newest phone number as 209-707-5268 and his previous phone number as 209-302-4866.

123.     T-Mobile subscriber records show that as of September 27, 2022, telephone number 209-395-4986 is subscribed to "Victor Rios" at PREMISES 1.  Telephone call analysis of the T-Mobile call records for this number shows that it was in contact with AISPURO-Quinonez's newest phone number 9 times between August 25, 2022, to September 13, 2022, and was in contact 23 times with AISPURO-Quinonez's previous phone number between July 9, 2022 and September 13, 2022.

124.      T-Mobile subscriber records show that as of September 27, 2022, the telephone number 209-808-3737 is also subscribed to "Victor Rios" at PREMISES 1.  Telephone call analysis of the T-Mobile call records for this number shows that it was in contact with AISPURO-Quinonez's newest phone number 87 times between August 25, 2022, to September 25, 2022, and was in contact 61 times with AISPURO-Quinonez's previous phone number between July 9, 2022 and September 13, 2022.

125.     It is important to note that commercial database phone records link both of these phone numbers to Victor Rios Lenin Beltran and Leticia Aispuro Quinonez, so it remains unknown precisely which individual regularly uses which phone number.  Regardless, based upon the number of calls between these phone numbers and AISPURO-Quinonez, as well as the subscriber of both phones being Victor Rios Lenin Beltran, I believe that both Leticia Aispuro Quinonez and Victor Rios Lenin Beltran remain in regular contact with AISPURO-Quinonez.

126.     Pacific Gas & Electric (PG&E) records show that as of August 2022, the subscriber name on the account for PREMISES 1 was still listed as "Victor Rios," or Victor Rios-Beltran.

127.     A check of the United States Postal Service (USPS) mail records was conducted for PREMISES 1, which indicated that there had been no recent change of address requests or mail forwards on record.  There were also no USPS accounts tied to the address and no packages had been delivered there in the last six months.

128.     A USPS mail record check was also conducted for 734 North Windsor Avenue, which indicated that there were no recent change of address requests or mail forwards on record, and no USPS accounts tied to the address.  However, USPS reported three names were associated with this new address:  Eduardo Rios, Leticia Aispuro, and Victor Rios.

129.     Based on the above data and intelligence, I believe that AISPURO-Quinonez's sister, Leticia Aispuro, may now be living at 734 North Windsor Avenue.  It remains unclear as to where Victor Lenin Rios Beltran is currently residing, as his vehicles have been observed at both PREMISES 1 and 734 North Windsor Avenue.  CS1 has told agents that Leticia Aispuro Quinonez and Victor Lenin Rios Beltran have separated multiple times in the past and may be briefly apart again.

130.     Based on my training and experience, as well as conversations with more experienced agents, it is common conduct among drug traffickers to store narcotics at locations other than their primary residence in order to better hide the location of the contraband from law enforcement.  Furthermore, it is common for drug traffickers to use family members and their residences to further facilitate drug trafficking activity in order to distance the illicit activity from themselves.  As a result, based on, among other things:  (a) the observations stated earlier in this affidavit, where AISPURO-Quinonez and AISPURO-PENA were seen departing and returning to PREMISES 1 before and after controlled purchases; (b) law enforcement's recent observations of AISPURO-PENA visiting PREMISES 1 in a manner consistent with the DTO's previous use of that residence as a stash house; and (c) law enforcement's investigation and surveillance showing that Victor Rios has continued to park his vehicle at PREMISES 1 and has remained in contact with AISPURO-Quinonez using a cell phone that is subscribed to PREMISES 1, I believe that there is probable cause to believe that the AISPURO drug trafficking organization is continuing to store drugs at PREMISES 1.

**P.     Vehicle Tracker Data on a Silver Toyota Tacoma Further Supports PREMISES 2 as a Residence for AISPURO-PENA**

131.     On March 1, 2022, this Court authorized a vehicle tracker warrant for the silver Toyota Tacoma with CA LP:  8P82419, which authorized GPS tracking of the silver Toyota Tacoma for a period of 30 days.  That authorized tracking period expired on March 31, 2022; however, this Court authorized the GPS tracking of the silver Toyota Tacoma for an additional period of 30 days, which

expired on April 30, 2022.

132.     Starting on the evening of April 1, 2022, the vehicle tracker data showed that the silver Toyota Tacoma would be parked on S. Olive Ave., in the nearby vicinity of PREMISES 2, almost every night.  Prior to April, the silver Toyota Tacoma would be primarily parked at night at the address of PREMISES 3.

133.     The aforementioned CS1 indicated that AISPURO-PENA had previously been staying at either his mother's or mother-in-law's house, prior to moving into PREMISES 2.  AISPURO-Quinonez had been renting out PREMISES 2, and they could not move immediately back into the residence. Based on the vehicle tracker data and CS1 debriefings, AISPURO-PENA—who agents observed driving the silver Toyota Tacoma on multiple occasions—likely moved into PREMISES 2 at the start of April 2022.  It remains unknown as to what date AISPURO-Quinonez moved back into PREMISES 2 and joined his son at this residence.

### Q.     Intelligence Indicating PREMISES 5 is the Residence of Daniel CARDENAS

134.     Based on multiple database queries and identifying information for CARDENAS, agents have concluded that PREMISES 5 is CARDENAS's residence.  CARDENAS's driver's license (which was issued in 2019) gives PREMISES 5 as his address.  A commercial database query of this address has associated PREMISES 5 with CARDENAS based upon credit reporting from 2007 to 2020. Additionally, several other members of the CARDENAS family are linked to this address via credit reporting data, including Agustin Cardenas, Maria Cardenas, and Lucia Cardenas.  Though the commercial database query did not indicate the exact relationship between these individuals and CARDENAS, it did list them as relatives with one degree of separation.

135.     During the controlled purchase on June 7, 2022, agents observed CARDENAS driving a white Kia Forte, with CA LP: 8TAX443.  A search of California DMV records shows that this vehicle is currently registered in the name Daniel CARDENAS at PREMISES 5.

136.     While agents have not observed CARDENAS leaving or arriving at PREMISES 5 with drugs or illicit proceeds, based on my training and experience, as well as conversations with more experienced agents, and as descried in more detail later in this affidavit, it is common conduct among drug traffickers to store drugs and other contraband at their residences.  In addition, as described

elsewhere in this affidavit, I know that drug-traffickers use cell phones and other electronic devices to coordinate their drug-trafficking activities, and that members of the AISPURO-Quinonez DTO have used cell phones to coordinate controlled buys on numerous occasions in the past.  These communications devices thus often contain evidence of controlled substance offenses.  I also know based on my training and experience, that drug-traffickers keep their cell phones and other electronic communication devices at their primary residences.  Based on all of this information, I believe that there is probable cause to believe that law enforcement will find evidence of CARDENAS's involvement in controlled substance offenses at PREMISES 5, including drugs, contraband, pay/owe sheets, notebooks, communications devices, and other items of evidentiary value.

### R.    Utility Records Related to Each PREMISES

137.    Based on responses to law enforcement subpoenas, the following are the PG&E utility account subscriber records for the following PREMISES:

- PREMISES 1 – Subscriber Name: Victor Rios
    - Commercial databases associate Victor Lenin Rios Beltran with this address through credit reporting and previously associated his paramour, Leticia Aispuro Quinonez with this address.  Moreover, CS1 indicated that AISPURO-Quinonez spends much of his time here.

- PREMISES 2 – Subscriber Name: Rosalva Aispuro
    - Commercial databases show that Rosalva Aispuro was the spouse of AISPURO-Quinonez; however, CS 1 stated that they are separated or divorced, though she is the mother of AISPURO-PENA.

- PREMISES 3 – Subscriber Name: Grace Ortiz
    - Commercial databases list Grace Ortiz as being associated with this address from January 1, 2011 to October 1, 2021; however, this address is associated with a number of individuals, including AISPURO-PENA as of May 12, 2022, and Rosalva Aispuro as of October 13, 2021.

- PREMISES 4 – PG&E did not find any records for this address.
- PREMISES 5 – Subscriber Name: Maria E. Cardenas

    o   A commercial database query for Maria E. Cardenas indicates that she is a relative of Daniel CARDENAS with one degree of separation; however, the report does not indicate the source of this data.  A commercial database query does show that Maria E. Cardenas is linked to PREMISES 5 via bank account information and credit reporting.

**S.**    **Training and Experience Regarding Drug Trafficking and Drug Traffickers**

138.    As a result of my experience and training, I have learned that traffickers who deal in various quantities of controlled substances, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions.  Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators.  These records may be kept on paper or contained in memory calculators or computers.  It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control. It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live.   It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time.

139.    From my training and experience, I know that individuals involved in drug trafficking frequently store their drugs, drug proceeds, weapons, and other contraband in rooms and areas of their residences that appear to belong to, are controlled by, and/or are accessible to other occupants, including for example, bedrooms belonging to children, other family members, or roommates, in an effort to conceal the evidence from law enforcement and to disguise their ownership and control of the contraband in the event that it is seized.  This warrant therefore seeks permission to search the entire premises of the residence for which the warrant is sought, including any location where there is reasonable cause to believe the items listed in Attachment B may be found.

140.    Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and

although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them.  Typically, traffickers keep records of those registrations and transactions in their residence.

141.    I have learned that large-scale drug traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business.  It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining, transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

142.    In my experience, traffickers commonly have in their possession, that is, on their person, at their residence and in the areas under their control, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons.  Such firearms are used by drug violators to protect their illicit drug trafficking operations, and themselves against law enforcement and other drug violators because the illicit drug trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds.  Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers and quantities of currency.

143.    In my experience, traffickers commonly have in their possession (that is, on their person, at their residences, in their vehicles, and in the areas under their control and which they have free and ready access to) drugs—including, but not limited to, in this case, heroin—which they intend to distribute.  It is my experience that these drug traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

144.    In my experience, drug traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product.  Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

145.    In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver's licenses, employment cards,

insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and used in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

146.    In my experience, drug traffickers often use vehicles to transport and distribute controlled substances to facilitate their trafficking activities.  It has also been my experience that traffickers will also use vehicles as locations in which to store controlled substances prior to distribution. During prior investigations, I have observed that drug traffickers will often use vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

147.    In addition, these traffickers tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" the proceeds derived from the distribution of controlled substances.

148.    In establishing these entities, the traffickers often must travel to meetings in foreign countries as well as domestically.  As a result of that travel, records are generated reflecting travel by commercial and private aircraft, Commercial Ocean and private vessels as well as common carrier(s).

149.    It has been my experience in the past, and particularly in this case, that when suspects use mobile telephones to communicate with cooperating individuals or undercover agents to set up the drug deals, records relating to these activities will be found stored in the cellular telephone.

150.    I know that narcotics traffickers use mobile telephones to communicate with one another, either by voice or text message.  Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones.  Mobile telephones also contain in their memory a telephone book.  This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business.  Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user.  The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the

communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate.  Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer.  Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity.  Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

151.    In this specific case, during each aforementioned controlled purchase conducted by CS1 and CS2 from the AISPURO-Quinonez DTO, AISPURO-Quinonez and/or his co-conspirators have personally communicated with CS1 and/or CS2 utilizing a cell phone.  During the course of this investigation, law enforcement agents have also identified multiple phone numbers used by AISPURO-Quinonez and his co-conspirators.  Based on my training and experience, it is common for drug traffickers to use both calls and text messages to communicate and facilitate narcotic transactions. Furthermore, CS1 has informed agents that AISPURO-Quinonez will use the program WhatsApp in order to communicate with family members and others involved in his drug trafficking operations. Therefore, agents are seeking to seize any potential cell phones that could have been utilized by AISPURO-Quinonez to facilitate his drug trafficking activities.

152.    As described above and in Attachment A, this affidavit seeks permission to search and seize things that are related to heroin and methamphetamine distribution, in whatever form such things are stored.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Even when a user deletes information from a device, it can sometimes be recovered with forensics tools.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

153.    It is my opinion, based on my training and experience, and the training and experience of

other law enforcement investigators to whom I have spoken, that the items listed in Attachment B are items most often associated with the distribution of controlled substances, including heroin, as well as the proceeds from such illegal operations.

154.    The facts set forth in this affidavit are known to me as a result of my personal participation in this investigation, through conversations with other agents and detectives who have participated in this investigation, and from reviewing official reports, documents, and other evidence obtained as a result of this investigation.  This affidavit is not an exhaustive enumeration of the facts that I have learned during the course of this investigation but, instead, are facts that I believe support a finding of probable cause to search the requested locations.

155.     Based on my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and their persons the items described in Attachment B. Individuals involved in drug dealing also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances.  Therefore, I am requesting authority to seize all the items listed in Attachment B to this affidavit and incorporated here by reference.

**T.    Conclusion**

156.    Based on the foregoing, I believe there is probable cause to search the following locations, and request that the Court issue search warrants for the following locations:

- The property located at 1044 South David Space 18, Stockton, CA, 95205 (PREMISES 1)
- The property located at 715 South Olive Avenue, Stockton, CA, 95215 (PREMISES 2)
- The property located at 2632 Flemons Avenue, Stockton, CA, 95205 (PREMISES 3)
- The property located at 2125 Saint Lakes Way, Stockton, CA, 95206 (PREMISES 4)
- The property located at 3436 Phelps St., Stockton, CA, 95206 (PREMISES 5)

**III.    COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

157.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the

warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

158. *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

159.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contains information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

160. *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain

evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

161.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

162.   Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## IV.     CONCLUSION

163.     I submit that this affidavit supports probable cause for warrants to search PREMISES 1 through 5, which are more particularly described in Attachments A-1 through A-5, in order to seize the items described in Attachment B.

164.     Moreover, I submit that there is probable cause to issue criminal complaints and arrest warrants for the following individuals:

a)      Jose Luis AISPURO-Quinonez for conspiracy to distribute heroin and/or methamphetamine and distribution of heroin and/or methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846.

b)      Jesus Mateo AISPURO-PENA for conspiracy to distribute heroin and/or methamphetamine and distribution of heroin and/or methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846.

c)      Daniel CARDENAS for conspiracy to distribute heroin and distribution of heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846.

d)      Daniel PADILLA-Gutierrez for conspiracy to distribute heroin and distribution of heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846.

e)      Maria Alicia LUCIO-Castillo for conspiracy to distribute heroin and distribution of heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846.

f)      Ismael MIRANDA for conspiracy to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and 846.

## V.     REQUEST FOR SEALING

165.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and

disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

/s/ Kevin Rundle
Kevin Rundle
Special Agent
United States Department of Justice, Drug
Enforcement Administration (DEA)

Subscribed and sworn telephonically on: October 14, 2022

The Honorable Jeremy D. Peterson
UNITED STATES MAGISTRATE JUDGE

Approved as to form by AUSA AARON D. PENNEKAMP

AFFIDAVIT                                                    49

## ATTACHMENT A-1

A.  The property to be searched is 1044 South David Avenue, Stockton, CA, 95205, further described as a white double wide trailer with red trip and a slight gable roof, with additional metal sheeting covering a car port, which runs alongside the residence.  The residence is located at Space 18, within the Golden Gate Estates Mobile Home Park.  A photo of the premises to be searched is below



B.  During this search, law enforcement also intends to search the person of any individual located at the premises, which may include Jose Luis AISPURO-Quinonez, DOB: 09-28-1975, and/or Jesus Mateo AISPURO-PENA, DOB: 10-18-1999.

C.  During this search, law enforcement also intends to search the following vehicles

parked at the premises:

    a.   AISPURO-Quinonez's silver Toyota Tacoma with California license plate: 8P82419 and VIN: 3TMLU4EN9AM051735.  The silver Toyota Tacoma with CA LP: 8P82419 has been observed being driven by AISPURO-Quinonez and AISPURO-PENA and has been seen parked at 1044 South David Avenue, Stockton, CA.  Additionally, as laid out in the above probable cause, this vehicle was utilized by AISUPURO-Quinonez's son, AISPURO-PENA, to sell narcotics to CS1.

    b.   ~~All vehicles over which any owner, occupant, or resident of the premises has dominion and control, as determined by agent's observation of such person operating or accessing vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person.~~

## ATTACHMENT A-2

A. The property to be searched is 715 S. Olive Avenue, Stockton, CA, 95215, further described as a beige single-story house with gray gable roof, a covered garage and a metal and wood fence surrounding the front.  The residence has a backyard with a wood fence, a small shed, and an additional building, the same color as the main residence, with a gabled roof as well.  Photos of the premises to be searched are below



B.  During this search, law enforcement also intends to search the person of any individual located at the premises, which may include Jose Luis AISPURO-Quinonez, DOB: 09-28-1975, and/or Jesus Mateo AISPURO-PENA, DOB: 10-18-1999.

F.  During this search, law enforcement also intends to search the following vehicles parked at the premises:

    a.  AISPURO-Quinonez's silver Toyota Tacoma with California license plate: 8P82419 and VIN: 3TMLU4EN9AM051735.  The silver Toyota Tacoma with CA LP: 8P82419 has been observed being driven by AISPURO-Quinonez and AISPURO-PENA and is believed to be parked overnight at 715 S. Olive Avenue, Stockton, CA, 95215.  Additionally, as laid out in the above probable cause, this vehicle was utilized by AISUPURO-Quinonez's son, AISPURO-PENA, to sell narcotics to CS1.

    b.  ~~All vehicles over which any owner, occupant, or resident of the premises has dominion and control, as determined by agent's observation of such person operating or accessing vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person.~~

## ATTACHMENT A-3

A.  The property to be searched is 2632 Flemons Avenue, Stockton, CA, 95205, further

 described as a brick and tan single-story house with a covered garage and a brown

 roof.  The residence has a wooden fence surrounding the front yard and what appears

 to be a metal and wood fence surrounding the backyard.  The backyard also contains

 a shed.  Photos of the premises to be searched are below





B.  During this search, law enforcement also intends to search the following vehicles parked at the premises:

    a.  ~~All vehicles over which any owner, occupant, or resident of the premises has dominion and control, as determined by agent's observation of such person operating or accessing vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person.~~

## ATTACHMENT A-4

A. The property to be searched is 2125 Saint Lakes Way, Stockton, CA, 95206, further

   described as a blue single-story house with white trim, a brown gable roof, and a

   covered garage.  The house has a backyard that is surrounded by a wooden fence.  A

   photo of the premises to be searched is below.



B. During this search, law enforcement also intends to search the person of any

   individual located at the premises, which may include Daniel CARDENAS, DOB:

   03-27-1986.

C. During this search, law enforcement also intends to search the following vehicles

   parked at the premises:

    a.  The White Kia Forte with California license plate: 8TAX443 and VIN:

3KPFK4A74HE128137.  As described in the probable cause section, the White Kia Forte CA LP: 8TAX443 has been observed being driven by Daniel CARDENAS and was used by CARDENAS to pick up AISPURO-Quinonez at 1044 South David Ave. Space 18, Stockton, CA, and subsequently deliver approximately four ounces of heroin to the CS on June 7, 2022.  A search of DMV records shows that this vehicle is currently registered in the name Daniel CARDENAS at 3436 Phelps St., Stockton, CA.

b.  ~~All vehicles over which any owner, occupant, or resident of the premises has dominion and control, as determined by agent's observation of such person operating or accessing vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person.~~

### ATTACHMENT A-5

A.  The property to be searched is 3436 Phelps St., Stockton, CA, 95206, further
    described as a white single-family house with light grey trim and a grey gable roof, a
    covered garage, and a metal fence around the front yard.  A photo of the premises to
    be searched is below



B.  During this search, law enforcement also intends to search the person of any
    individual located at the premises, which may include Daniel CARDENAS, DOB:
    03-27-1986.

C.  During this search, law enforcement also intends to search the following vehicles
    parked at the premises:

   a.  The White Kia Forte with California license plate: 8TAX443 and VIN:
       3KPFK4A74HE128137.  As described in the probable cause section, the
       White Kia Forte CA LP: 8TAX443 has been observed being driven by Daniel
       CARDENAS and was used by CARDENAS to pick up AISPURO-Quinonez
       at 1044 South David Ave. Space 18, Stockton, CA, and subsequently deliver
       approximately four ounces of heroin to the CS on June 7, 2022.  A search of

California DMV records shows that this vehicle is currently registered in the name Daniel CARDENAS at 3436 Phelps St., Stockton, CA.

b. ~~All vehicles over which any owner, occupant, or resident of the premises has dominion and control, as determined by agent's observation of such person operating or accessing vehicle; DMV records showing ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person.~~

## ATTACHMENT B

1.     All records relating to violations of Title 21 U.S.C. Sections 841(a)(1) & 846 – Conspiracy, Distribution, and Possession with Intent to Distribute Heroin and/or Methamphetamine, those violations involving Jose Luis AISPURO-Quinonez and his co-conspirators, including Jesus Mateo AISPURO-PENA, Daniel CARDENAS, Daniel PADILLA-Gutierrez, Maria Alicia LUCIO-Castillo, and Ismael MIRANDA, occurring after April 15, 2020 and through the present, including:

     a.    Controlled substances, including heroin, or items frequently used to distribute heroin, or items containing residue from the distribution of heroin; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including glass vials (including dropper vials), alcohol and solvents, plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

     b.    United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase heroin, from AISPURO-Quinonez or other co-conspirators during in this investigation;

     c.    Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

d.  Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1);

e.  Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

f.  Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

g.  Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

h.  Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

    i.    Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

    j.    Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person;

    k.    Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.

2.    As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

3.     This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.